**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | |
| WHATEVER, LLC, | : | Case Number 11-26288-JAD |
| | : | |
| Debtor. | : | Chapter 11 |
| _____ X | : | |
| | : | |
| WHATEVER, LLC, | : | |
| | : | |
| Movant, | : | Related to Doc. No. 60 |
| | : | |
| WELLS FARGO BANK, N.A. | : | |
| SUCCESSOR to LASALLE BANK, | : | |
| NATIONAL ASSOCIATION AS | : | |
| TRUSTEE FOR THE REGISTERED | : | |
| CERTIFICATE HOLDERS OF BANC | : | |
| OF AMERICA COMMERCIAL | : | |
| MORTGAGE, INC., COMMERCIAL | : | |
| MORTGAGE PASS-THROUGH | : | |
| CERTIFICATES, SERIES 2001-PB1 | : | |
| | : | |
| Respondent. | : | |
| _____ X | | |

## MEMORANDUM OPINION

The matter before the Court is a *Motion to Enforce Settlement Agreement* filed by Whatever, LLC (the "Debtor"). This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(2)(A) (B), (K) and (O). During the June 18, 2012 evidentiary hearing, both parties, through their counsel, consented to this Court entering final judgment on the instant matter. Such consent is sufficient to allow this Court to hear and finally determine the matter, regardless of whether it is statutorily defined as "core" or "non-core". See ARDI Limited Partnership v. The Buncher Company, (In re River Entertainment Co.), 467 B.R. 808 (Bankr. W.D.

00007993.WPD

Pa. 2012). For the reasons set forth below, *the Motion to Enforce Settlement Agreement* is denied.

I.

The Debtor owns commercial real estate located at 610-960 Chauvet Dr., North Fayette Township, PA 15275 (the "Property"). The Property is subject to a mortgage (the "Mortgage") held by Wells Fargo Bank, N.A. as successor to LaSalle Bank National Association, as Trustee for the Registered Certificate Holders of America Commercial Mortgage, Inc., Commercial Mortgage Pass-Through Certificates, Series 2001-PBI ("Wells Fargo"). Toward the end of 2008, at the peak of the financial crisis in the United States, two tenants in the Property filed for bankruptcy protection and a third tenant informed the Debtor of its intent to not renew its lease, leaving 70% of the Property vacant.

In October of 2009, the Debtor ceased making payments on the Mortgage to pursue a potential settlement with Wells Fargo. At that time, the Debtor began discussions with the loan servicer, Centerline Servicing n/k/a C-III Asset Management ("Loan Servicer"), which offered the Debtor two options: a discounted payoff ("Discounted Payoff") or a deed in lieu of foreclosure ("Deed in Lieu"). A Discounted Payoff would allow the Debtor to pay the loan off at a discount, while a Deed in Lieu would involve the Debtor conveying the property to Wells Fargo in satisfaction of the mortgage.

At this point, a series of e-mails commenced settlement negotiations between the parties. These negotiations began on December 16, 2009, with Mr.

Michael S. Wasserman, a principal of the Debtor, discussing options with Mr. Michael Dickerson, an employee of the Loan Servicer. After these initial discussions failed to produce a settlement, the attorneys for both sides took over the negotiations. The attorney for the Debtor was Peter C. Cotelidis ("Attorney Cotelidis") and the attorney for Wells Fargo was Richard A. O'Halloran ("Attorney O'Halloran"). Over a period of approximately four months, Attorney Cotelidis and Attorney O'Halloran attempted to negotiate and effectuate a Discounted Payoff arrangement presented initially by Attorney O'Halloran in an e-mail directed to Attorney Cotelidis on December 23, 2009.

This December 23, 2009 e-mail details an offer (the "Draft Discounted Payoff Offer") from Wells Fargo to accept $2,518,000.00 in full payment of the Debtor's Mortgage, less $213,205.00 of reserve credit held by Wells Fargo, leaving a net Discounted Payoff amount of $2,304,795.00 to be paid. The e-mail further provided that the Discounted Payoff amount was to be made by January 15, 2010. (Doc. # 94, *Proposed Exhibits of Trustee*, Exhibit 1-A). While the Discounted Payoff amount was to be tendered by January 15, 2010, the payoff terms further provided that the funds were to be "[w]ired to counsel's escrow account not later than 12/31/09." (Id. at ¶ 7). Under this offer, the Debtor's December and January Payments were waived, but the Debtor was required to pay its November payment of $31,850.03 immediately. (Id.) The email also included the following language underneath the payoff terms:

Subject to final approval by committee and satisfactory documentation.

> Subject to written or email confirmation from borrower (through counsel) of acceptance of the above terms, not later than 12/31/09.

(Id.; Doc. No. 102, *Transcript regarding Hearing Held 6/18/12*, pp. 47: 13-25, 48: 1-13).

On January 5, 2010, which was after the December 31, 2009 deadline described above, Attorney Cotelidis e-mailed a response to Attorney O'Halloran. In his January 5, 2010 e-mail, Attorney Cotelidis acknowledges the condition for final approval by committee as contained within the Wells Fargo Draft Discounted Payoff Offer. Mr. Cotelidis stated in his e-mail:

> My client is prepared to wire the sum of $31,850.03 upon receipt that the committee has approved the [Discounted Payoff] as a note purchase. If the closing is not completed by 1/31/10 through no fault of my client, there should be no additional payments made by my client.

(Doc. # 94, Exhibit 7). This e-mail was the first reference of a note purchase as opposed to a true discounted payoff.

Later on January 5, 2010, Attorney O'Halloran responds, again by e-mail, noting that Attorney Cotelidi's understanding of the committee approval condition may be misguided, as Attorney Cotelidi's seemed to be interpreting such approval as a condition precedent, rather than a condition subsequent, to the Debtor's depositing the net payoff amount into Attorney Cotelidi's escrow account. Attorney O'Halloran stated in his e-mail the following:

> Your e-mail also marks the first time we have been notified that the borrower takes the position that committee approval is a condition precedent to your clients performance. I have no authority to agree to any such a condition.

(Doc. # 94, Exhibit 7). Attorney Cotelidis, also on January 5, 2010, then responded in part:

> ...my client needs to be able to do it as a note purchase. If that can be accomplished we are ready to proceed. If that can't be done, we may have to go back to the [Deed in Lieu] scenario...

(Id.; Doc. # 102, p. 52: 9-19).

The following day, Attorney Cotelidis followed up on his note purchase request in an email to Attorney O'Halloran asking, "Any word from your client concerning the note purchase?" (Doc. # 94, Exhibit 7). Attorney O'Halloran responds on the same day, "Not yet. I think it'll take a couple more days but I'll stay on it." (Id.) On January 11, 2010, Attorney O'Halloran sends another email to Attorney Cotelidis, notifying him that "The note sale structure is still under review/discussion internally. ... I'll ... be back to you as soon as I have word." (Id.)

These e-mail negotiations continued over the following month, but the Discounted Payoff was never completed. On February 18, 2010, after the December 31, 2009 deadline for depositing the Discounted Payoff funds into escrow had expired, Attorney O'Halloran emailed Attorney Cotelidis and inquired, "Has your client deposited the $2,304,795.00 in payoff funds? If so, I am ready to prepare the documentation -which will allow us to close this month." (Doc. # 94, Exhibit 9; Doc. # 102, p. 24:1-4). Attorney Cotelidis responds, "Rich, I was not aware that you were not going to prepare the docs until I had the $$ in hand..."(Doc. # 94, Exhibit 9). On February 19, 2010, Attorney O'Halloran extended the closing deadline and wrote:

> We'll move the 'on or before' date for closing to March 1, 2010. We'll expedite our approval process internally and I'll have the documents out by Monday for your review. Then it'll be up to the borrower to fund (I am assuming we reach an agreement on the documentation). If they fund on or before March 1, 2010 then we're done. If not, then we're back to square one, which means that we're looking at our loan doc remedies etc...

(Doc. # 94, Exhibit 10; Doc. # 102, p. 26:8-14). The Debtor wired the payoff amount of $2,304,795.00 to Attorney Cotelidis on February 19, 2010. The following day, February 20, 2010, the funds were deposited into Attorney Cotelidis escrow account. Also on February 20, 2010, Attorney O'Halloran sent an e-mail to Attorney Cotelidis with a draft agreement (the "Draft Discounted Payoff Agreement") attached, noting again that the agreement was "subject to review and approval by [Wells Fargo], who hasn't seen it yet." (Doc. # 94, Exhibit 8). Attorney Cotelidis then made eight proposed modifications to the Draft Discounted Payoff Agreement, contained in an email response sent to Attorney O'Halloran two days later. (Doc. # 94, Exhibit 11; Doc. # 102, p. 37: 13-22).

On February 23, 2010, Attorney O'Halloran sent a e-mail to Attorney Cotelidis stating, "Committee rejected the discounted payoff. We may be able to revisit it down the road, but for now we don't have a deal." (Doc. # 94, Exhibit 12; Doc. # 102, p. 28:1-4). That same day, Attorney Cotelidis responded in part:

> Please advise your client that my client's offer to do this deal still stands until 5:00 pm tomorrow. If the deal is not consummated by then, Iw ill [*sic*] reverse my clients wire transfer...

(Doc. # 74, *Response of Wells Fargo Bank N.A., as Successor to LaSalle Bank, National Association, as Trustee for the Registered Certificateholders of Banc of*

*America Commercial Mortgage, Inc., Commercial Mortgage Pass-Through Certificates, Series 2001-PB1 ("Holder") To Debtor's Motion To Enforce Settlement,* Exhibit B). In response, Attorney O'Halloran stated that it would not be possible for his client to meet the Debtor's deadline:

> However, additional information is needed, as highlighted at the committee level yesterday and my client is in the process of obtaining that information. However, we will not have that information by 5:00 today.

(Id.) Attorney Cotelidis subsequently reversed the wire transfer. (Id.) From April 5, 2010 onward, negotiations on the Discounted Payoff ended and those on the Deed in Lieu continued with no deal being ultimately concluded.

On March 8, 2011, Wells Fargo filed a *Complaint* in Mortgage Foreclosure against the Debtor at Case No. 11-CV-311-RCM in the U.S. District Court for the Western District of Pennsylvania. On October 10, 2011, the Debtor filed a Chapter 11 Voluntary Petition with this Court. On February 14, 2012, the Debtor filed a *Motion to Enforce the Settlement Agreement* based on the contention that a binding settlement was formed pursuant to the Draft Discounted Payoff Offer. The Debtor argues that it accepted Wells Fargo's offer by transferring funds into Attorney Cotelidis' escrow account, resulting in a fully binding and enforceable settlement agreement. A trial was held on the matter on June 18, 2012. Following the submission of *Post-Hearing Briefs* by both parties, the matter is now ripe for adjudication.

## II.

Pennsylvania law should apply in determining whether a valid and

enforceable settlement agreement exists between the parties. In <u>Edwards v. Born</u>, the Third Ciruict noted, "[I]t is clear to us that territorial law provides the rule of decision on the question of an attorney's authority to settle his client's action when the action does not implicate rights and duties derived from federal law." 792 F.2d 387, 389 (3d Cir. 1986) (citing <u>Glazer v. J.C. Bradford & Co.</u>, 616 F. 2d 167, 169 (5th Cir. 1980)).

As the Third Circuit has noted, "[s]ettlement agreements are nothing more than contracts, and therefore basic contract principals apply" to a court's interpretation of the binding effect thereof. <u>Cal. Sun Tanning USA, Inc. v. Elec. Beach, Inc.</u>, 369 Fed.Appx. 340, 346, n.6 (3d Cir. 2010). See also <u>Mazzella v. Koken</u>, 559 Pa. 216, 224, 739 A.2d 531, 536 (1999) ("To be enforceable, a settlement agreement must possess all of the elements of a valid contract"). It is essential to the enforceability of a settlement agreement that the minds of the parties should meet upon all the terms, as well as the subject-matter, of the agreement. <u>Mazzella v. Koken</u>, 559 Pa. at 224. If all of the material terms of a bargain are agreed upon, the settlement will be enforced; but if there exist ambiguities and undetermined matters which render a settlement agreement impossible to enforce, the settlement agreement will be set aside. <u>Id</u>. at 225.

As explained in <u>Cal. Sun Tanning</u>, which also involved a series of e-mails, "[i]t is by now axiomatic under Pennsylvania law that 'the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically

enforced." 369 Fed.Appx. at 346 (citing Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986)). In Cal. Sun Tanning, the court held that a series of e-mails between the parties manifested the parties' mutual assent and intention to be bound by material terms of a contemplated settlement agreement. In ascertaining the intent of the parties, the court must look to the "outward and objective manifestations of assent of the parties," as opposed to their "undisclosed and subjective intentions." Cal. Sun Tanning, 369 Fed.Appx. at 346.

Thus, the issue to be decided by this Court is whether the December 23, 2009 e-mail to Attorney Cotelidis could be accepted without committee approval, and whether any of the parties' responses constituted a valid acceptance creating an enforceable settlement agreement. In other words, the issue is whether Wells Fargo and the Debtor manifested an intention to be bound to a settlement agreement.

### III.

The Draft Discounted Payoff Offer expressly included a condition for committee approval, and this condition was never satisfied. In addition, the Debtor never unconditionally accepted the Draft Discounted Payoff Offer or the Draft Discounted Payoff Agreement (together, the "Draft Discounted Payoff"). As discussed more fully below, there was no meeting of the minds or mutual asset, and thus, the parties never formed a binding or enforceable agreement.

### A.

The court in Rich v. G.W. Pifer Sons discussed the effect of contracting

parties' use of conditions in analyzing the mutual asset requirement of a contract, noting that "in order to constitute a contract there must be an offer on one side and an unconditional acceptance on the other." 100 Pa. Super. 483, 487 (1930). The Rich Court held, "So long as any condition is not acceded to by both parties to the contract, the dealings are mere negotiations and may be terminated at any time by either party while they are pending. There must be a meeting of minds in order to constitute a contract." Id.

The December 23, 2009 e-mail from Attorney O'Halloran to Attorney Cotelidis qualifies as an offer. However, this was a conditional offer because it states that the offer was "[s]ubject to final approval by committee and satisfactory documentation" and "[s]ubject to written or email confirmation from borrower (through counsel) of acceptance of the above terms, not later than 12/31/09." (Doc. # 94, Exhibit 1-A). This condition was never satisfied; rather, the committee rejected the Discounted Payoff. Thus, at the time of Attorney Cotelidis' alleged acceptance of the Draft Discounted Payoff Offer,[1] and because committee approval was still required, there existed "undetermined matters" which rendered the settlement impossible to enforce. See Mazzella v. Koken, 559 Pa. at 224, 739 A.2d at 536. Because the express condition for committee approval was never satisfied,

---

[1] As discussed more fully below in Section B of this *Memorandum Opinion*, Attorney Cotelidis' responses cannot be interpreted as acceptances. Because his responses never unconditionally accepted the Discounted Payoff Offer but rather proposed note purchases and included other additional material terms, Attorney Cotelidis' responses are counteroffers and rejections of the Discounted Payoff Offer. See Mazzella v Koken, 559 Pa. at 228.

there was no mutual assent or meeting of the minds as required to create an enforceable settlement agreement or contract.

The Debtor tries to argue that committee approval had been waived, or, in the alternative, that the Debtor assumed that it had occurred. However, the committee specifically rejected the Draft Discounted Payoff Agreement as set forth in the February 23, 2010 e-mail from Attorney O'Halloran to Attorney Cotelidis. (Doc.# 102; p. 28:1-4; Doc. # 94, Exhibit 12). The Debtor nonetheless attempts to show that a settlement had been reached prior to that date by referencing the February 19, 2010 e-mail from Attorney O'Halloran to Attorney Cotelidis. In this email, Attorney O'Halloran states in part, "if they fund on or before March 1, 2010 then we're done." (Proposed Exhibits of Trustee, Exhibit 12; See Doc. # 102, pp. 26, 12-14; Doc. # 94, Exhibit 10).  The Debtor takes this statement out of context. Attorney O'Halloran also writes in the February 19, 2010 e-mail, "We'll expedite our approval process internally," indicating that committee approval was still required and had not yet been received. (Doc. # 102, p. 26:8-14; Dox. # 94, Exhibit 10).

After Attorney O'Halloran communicated to Attorney Cotelidis in the February 23, 2010 e-mail that the committee rejected the Draft Discounted Payoff, he sent Attorney Cotelidis another email on April 5, 2010 confirming that his client could "conclude a [Deed in Lieu] transaction not later than the end of April," and requested that Attorney Cotelidis respond whether that was "acceptable." (Doc. # 94, Exhibit 13). On April 6, 2010, Attorney Cotelidis responded with only, "Rich,

My client wants to know how much of the escrow is going to be refunded at the time we do the [Deed in Lieu]." (Id.) Attorney Cotelidis' response suggests that Attorney Cotelidis accepted that the Discounted Payoff would not occur and the Debtor could instead pursue a Deed in Lieu. Attorney Cotelidis never stated in any of the e-mails following the committee's rejection of the agreement the belief that an enforceable settlement agreement had been formed by the December 23, 2009 e-mail.

Despite the express condition for committee approval, the Debtor argues that a "valid, fully binding settlement agreement" was formed by the Debtor's depositing the payoff funds into Attorney Cotelidis' escrow account. (See Doc. # 60, *Motion to Enforce Settlement*, ¶ 10). During Attorney Cotelidis' deposition taken on May 18, 2012, Attorney Cotelidis was asked to show any written e-mail or other document indicating that the transaction had been approved, to which he responded:

> Well, there is no specific document that says it has been approved, but looking at the context and totality of the circumstances and the fact that we were told to have money deposited into my escrow account coupled with the fact that we were furnished with definitive documentation led to my standpoint, to the inescapable conclusion we had a deal.

(Doc. # 94, Exhibit 4, p. 21:20-25 and p. 22:1-4). This testimony indicates Attorney Cotelidis' belief that the Draft Discounted Payoff Offer could have been, and was, accepted by the Debtor's act of depositing the funds into the escrow account. However, the offer was explicitly conditioned on committee approval, and the Debtor has not provided any evidence to the contrary.

In his testimony, Attorney O'Halloran stated:

> [The] commercial real estate world is a mess... we were in discussions with any number of borrowers about discounted pay-offs, deeds in lieu modifications, consent foreclosures, kind of full range of possibilities, modifications, to some degree.

(Doc. # 94, Exhibit 3, p. 53:14-18). He also asserted that it was common occurrence to reach an agreement in principal on a discounted payoff, then obtain committee approval only to find that the borrower could not perform in the end. Thus, it became a common for the lender to require the borrower to escrow the funds before going through all of the steps to ensure that if an agreement was reached then the lender could be assured the borrower could perform. As such, in the context of this case, the funds were put in escrow before approval was obtained by the committee to ensure that the funds would be available to complete the transaction, if approval was ultimately obtained. This approval did not occur.

Because the express condition for committee approval was never satisfied, and the Debtor's arguments in response are without merit, the Court finds that there was no mutual assent or meeting of the minds as required to create an enforceable settlement agreement or contract.

B.

Furthermore, Attorney Cotelidis responded to the Draft Discounted Payoff with various counter-offers, the effect of which was to terminate the offer. See Mazzella v. Koken, 559 Pa. at 228; Allegheny Center Associates v. The Appliance Store, Inc., 148 B.R. 226, 223 (Bankr. W.D. Pa. 1992) ("A response which purports to accept an offer but which adds a new term or qualification to the original offer

is a counter-offer, not an acceptances"). For example, in Attorney Cotelidis' February 23, 2010 e-mail to Attorney O'Halloran, Attorney Cotelidis states:

> Please advise your client that my client's offer to do this deal still stands until 5:00 pm tomorrow. If the deal is not consummated by then, I will reverse my client's wire transfer...

(Doc. # 74, Exhibit B). Attorney Cotelidis added an additional term by necessitating that the deal be consummated by a certain time; as such, the statement is a counter-offer terminating the Draft Discounted Payoff.

Additionally, Attorney Cotelidis' comments and revisions to the terms of the Draft Discounted Payoff Agreement contained in his February 22, 2010 e-mail are also counter-offers. The Debtor argues that none of the proposed changes are "material" changes or revisions; this Court does not agree. For example, Attorney Cotelidis writes in his February 22, 2010 e-mail, "I will provide you with the name of the entity to which, we will have the mortgage assigned." (Doc. # 94, Exhibit 11; Doc. No. 102, p. 37:13-22). This revision is material, as it could change the nature of the transaction from a Discounted Payoff to a note purchase or sale which would be a significant change in terms.[2]

---

[2] Attorney O'Halloran testified at the June 18, 2012 trial that the "reference to the assignment of the mortgage was kind of a left turn," as it is a "note purchase concept, not a discounted payoff concept. ... And this would have been a significant change in terms." (Doc. # 102, p. 50:24-25, p. 57:19, and p. 58:1-2). Attorney O'Halloran further testified that note purchases "are more difficult to do. They're more time consuming. There are a number of other steps that we have to take to consummate them. But more importantly, we can't always do a note sale to a borrower. What we can and cannot do is governed by what's called the pooling and servicing agreement ... Some pooling and servicing agreements prohibit note sales to borrowers, and I believe that was what the case was here." (Doc. # 102, p. 51: 16-25).

Additionally, Attorney Cotelidis specifically refers to the Debtor's desire to pursue a note purchase at numerous times during the negotiations. (See Doc. # 94, Exhibit 7; Doc. # 102, p. 52: 9-19). Attorney Cotelidis' references to a note purchase constitute counter-offers. See Mazzella v. Koken, 559 Pa. at 228. The Debtor never unconditionally accepted the terms of the Draft Discounted Payoff; thus, no binding or enforceable agreement was formed.

The Debtor finally argues in its *Post Hearing Brief* that because no "essential" terms were changed, a binding contract was formed pursuant to the "knockout rule." (See Doc. # 105, p. 5). The "knockout rule" is a statutory exception to the mirror image rule.  Under the common law mirror image rule, a valid acceptance to an offer must identically mirror the terms of the offer.  Flender Corp. v. Tippins Int'l, Inc., 2003 Pa.Super. 300, 830 A.2d 1279, 1284 (Pa.Super.Ct. 2003). As set forth in Flender Corp. v. Tippins Int'l, Inc., the "knockout rule" provides that the "mere non-conformance between competing forms will not undermine the formation of a contract, so long as the parties demonstrate their mutual assent to essential terms." Id. However, as Wells Fargo successfully argues in its *Reply to Whatever LLC's Post Hearing Brief*, the "knockout rule" only applies to transactions in goods. 13 Pa. C.S. Section 2102. (See Doc. # 106, pp. 5-6). The instant case does not involve a transaction in goods, but rather land; the "knockout rule" does not apply.  Furthermore, Wells Fargo's condition for committee approval is an essential term; as discussed above, there was no mutual assent by the parties without satisfaction of this condition.  Thus, the "knockout rule" does not apply.

There existed no mutual assent between the Debtor and Wells Fargo because the condition for committee approval was never satisfied and because the Debtor never unconditionally accepted the offer. No binding or enforceable agreement was formed between the Debtor and Wells Fargo.

III.

In addition to there being no mutual assent to the settlement agreement, Wells Fargo could rely on two defenses to contract formation: lack of capacity and statute of frauds.

The first defense to be addressed is the lack of capacity of Attorney O'Halloran to unilaterally enter into a settlement on behalf of his client. The December 23, 2009 e-mail Attorney O'Halloran sent to Attorney Cotelidis specifically stated that the offer being proposed was "[s]ubject to final approval by committee." (Doc. # 94, Exhibit 1-A; Doc. # 102, p. 47, 13-25, p. 48, 1-13). Attorney O'Halloran had the authority to make the offer but still had to submit it to the committee for approval. "[A]n attorney must have express authority in order to bind a client to a settlement agreement." Reutzel v. Douglas, 582 Pa. 149, 152, 870 A.2d 787, 789-790 (2005). Thus, "a client's attorney may not settle a case without the client's grant of express authority, and such express authority grants the agent the authority to perform a certain task on the principal's behalf." Id. Attorney O'Halloran never had the express authority to enter into a enforceable settlement agreement with the Debtor without the approval of the committee.

The second defense to be addressed is the Pennsylvania Statute of Frauds,

which provides that no interest in land may be surrendered unless such surrender is made by deed or note, in writing, signed by the party surrendering the interest in land. See 33 P.S. Section 1 ("[N]o leases, estates or interest, either of freehold or terms of years, or any uncertain interest, of, in, to or out of any messages, manors, lands tenements or hereditaments, shall, at any time after the said April 10, 1772, be assigned granted or surrendered, unless it be by deed or note, in writing, signed by the party so assigning, granting or surrendering the same, or their agents, thereto lawfully authorized by writing, or by act and operation of law"); See also Eastgate Enterprises v. Bank and Trust Company of Old York Road, 345 A.2d 279 (PA. Super.Ct. 1975). In Pennsylvania, an interest in land includes mortgages.

No e-mail or other writing was produced by either party that was signed by an authorized representative of Wells Fargo surrendering Wells Fargo's interest in the property. On February 20, 2010, Attorney O'Halloran sent Attorney Cotelidis the Draft Discounted Payoff Agreement, to which Attorney Cotelidis made comments and revisions which he e-mailed back to Attorney O'Halloran on the same day. Neither party has stated that there was a signed agreement between the Debtor and Wells Fargo. As a consequence, any argument by the Debtor that would demonstrate that the parties had reached a oral agreement would be barred by the Pennsylvania Statute of Frauds.

IV.

In conclusion, Attorney O'Halloran's December 23, 2009 e-mail to Attorney Cotelidis was a conditional settlement agreement offer by Wells Fargo to the Debtor

for a Discounted Payoff which could not be accepted merely or solely by the Debtor's act of wiring $2,304,795.00 on February 19, 2010 to Attorney Cotelidis' escrow account. Committee approval, which was required under the terms of the conditional offer, was never waived or obtained. In addition, Attorney O'Halloran never had the express authority to enter into a settlement agreement without committee approval.

Therefore, judgment must be entered in favor of Wells Fargo Bank and against the Debtor. An order denying the Debtor's *Motion to Enforce Settlement* shall be issued by the Court.

Date: September 20, 2012        /s/ Jeffery A. Deller
                                **JEFFERY A. DELLER**
                                U.S. Bankruptcy Judge

**CASE ADMINISTRATOR TO MAIL TO:**
  Robert O. Lampl, Esq.
  John P. Lacher, Esq.
  David L. Fuchs, Esq.
  Joel M. Helmrich, Esq.
  P.J. Murray, III, Esq.